[No. S142546. Nov. 1, 2007.]

JOHN DOE, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

JOHN DOE 2, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

COUNSEL

Zalkin & Zimmer, Devin M. Storey, Irwin M. Zalkin; Taylor & Ring, David M. Ring, John C. Taylor; Bennett, Johnson & Galler, Todd A. Walburg and William C. Johnson for Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, Janet G. Bogigian, Assistant City Attorney, and Amy Jo Field, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.

Sedgwick, Detert, Moran & Arnold, Christina J. Imre, Orly Degani, Gregory H. Halliday and Thomas A. Delaney for Defendant and Respondent Boy Scouts of America.

Hennigan, Bennett & Dorman, J. Michael Hennigan and Lee W. Potts for Roman Catholic Archbishop of Los Angeles and Defense Liaison Counsel as Amici Curiae on behalf of Defendant and Respondent Boy Scouts of America.

Sweeney & Greene, James F. Sweeney and Stephen R. McCutcheon, Jr., for California Catholic Conference as Amicus Curiae on behalf of Defendant and Respondent Boy Scouts of America.

## OPINION

**MORENO, J.**—Code of Civil Procedure section 340.1, which extends the statute of limitations within which a victim of childhood sexual abuse may sue a person or entity who did not perpetrate the abuse but was a legal cause of it, requires that such actions be brought before the victim's 26th birthday, unless the defendant "knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an employee, volunteer, representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person . . . ." (Code Civ. Proc., § 340.1, subd. (b)(2).)

Plaintiffs, John Doe and John Doe 2, now in their 40's, sued the City of Los Angeles and the Boy Scouts of America alleging they had been sexually abused by David Kalish, a police officer, while they were participants in the Los Angeles Police Department Explorer Scout Program in the 1970's.[1] The superior court dismissed their actions on the ground that the statute of limitations had lapsed because plaintiffs failed to adequately plead that defendants "knew or had reason to know, or [were] otherwise on notice, of any unlawful sexual conduct" by Kalish. The Court of Appeal affirmed.

We granted review to examine whether the pleadings in these cases are sufficient to invoke the extended statute of limitations set forth in subdivision (b)(2). We conclude that subdivision (b)(2) is a remedial statute that the Legislature intended to be construed broadly to effectuate the intent that illuminates section 340.1 as a whole; to expand the ability of victims of childhood sexual abuse to hold to account individuals and entities responsible for their injuries. This principle of broad construction is not consistent with language in the opinion of the Court of Appeal below that imposed heightened pleading requirements on plaintiffs seeking to bring their actions

---

[1] We shall refer to plaintiffs as Doe 1 and Doe 2 or, collectively, plaintiffs; to the City of Los Angeles as the City; to the Boy Scouts of America as BSA; to the Los Angeles Police Department as LAPD; and to David Kalish as Kalish. All further unspecified statutory references are to the Code of Civil Procedure; section 340.1, subdivisions (b)(2) and (c) are referred to as subdivision (b)(2) or subdivision (c).

within this expansion of the statute of limitations in childhood sexual abuse cases. However, even without the stringent pleading requirements imposed by the Court of Appeal, we agree with its conclusion that the statute requires more specific allegations than were made by plaintiffs in this case. Accordingly, we affirm the judgment of the Court of Appeal.

## I. FACTS

### A. *Doe 1's Complaint*

Doe 1's operative pleading is his fourth amended complaint. He alleges that Kalish sexually abused him "between approximately 1974 through 1979" when he was under 18 years old and a participant in the "Law Enforcement Explorer Scout program" at LAPD's Devonshire division. Kalish, who was a supervisor of that program and allegedly used his position as supervisor to molest Doe 1, is not a party to this appeal. The complaint further alleges causes of action against the City, BSA, and "Law Enforcement Explorer Post 522" for negligent vetting, supervision, training and retention of Kalish, negligent supervision and management of the Explorer Scout program, negligent failure to warn and negligent failure to supervise and protect Doe 1.[2]

Doe 1 alleges that he first met Kalish while Doe 1 was a participant in the Deputy Auxiliary Police (DAP) program at LAPD's Devonshire division. The DAP program was sponsored by the police department and provided social and athletic activities to at-risk children between the ages of 12 and 14. According to Doe 1, it was common knowledge among LAPD officers that Kalish sought out and befriended boys in the DAP program who "bec[a]me his eventual victims." Kalish encouraged some of these boys to join the Explorer Scout program after they completed the DAP program "so that he could have further access to them in subsequent years." Doe 1 joined the Devonshire Explorer Scout program in 1975, when he was 14 years old, and remained a participant until sometime in 1979, when he was 17.

The Explorer Scout program was sponsored by BSA and LAPD. On information and belief, Doe 1 alleges that BSA required law enforcement agencies like LAPD to comply with guidelines that, among other things, required proper vetting and supervision of adult leaders, prohibited fraternization between the adult leaders and scouts outside of sanctioned events, and also prohibited one-on-one contact between adult leaders and scouts. The

---

[2] The City pointed out in its demurrer that Law Enforcement Explorer Post 522 has no separate existence and no legal identity apart from the City itself and is therefore a "nonsuable entity."

Explorer Scout program at Devonshire was supervised by a lieutenant who was the designated community relations officer. The lieutenant, in turn, reported to a captain. While the community relations officer exercised supervision and oversight, advisors like Kalish dealt directly with the participants.

Doe 1 alleges that a number of unqualified officers, including Kalish, were involved in the Devonshire Explorer Scout program. Doe 1 also alleges that Explorer Scouts were used for activities of questionable value to the community such as refurbishing Kalish's home. In exchange, Explorer Scouts, including Doe 1, were given beer, though none was old enough to drink alcohol legally.

Doe 1 alleges that Kalish was a pedophile and a friend of Vince Pirelli, a known pornographer who specialized in pornographic movies featuring boys. According to Doe 1, Pirelli was present at Kalish's house at the same time as some of the Explorer Scouts, and Kalish pressured Doe 1 to participate in Pirelli's pornographic movies. Another of Kalish's victims was also pressured into making pornographic movies for Pirelli. On information and belief, Doe 1 alleges that Kalish filmed sexual encounters at his home with victims other than Doe 1 and had a preference for "young slight blond boys," a description that fit at least two of his victims from the Explorer Scout program.

Doe 1 alleges on information and belief that it was "commonly known" that Kalish invited Explorer Scouts into his home outside of sanctioned program events and activities. Kalish would pick up plaintiff and other Explorer Scouts, at least one of whom Kalish also sexually abused, and drive them to his house. There, he allowed Explorer Scouts to drink and watch pornography. On one occasion, a boy who had been drinking at Kalish's house became drunk and was involved in a traffic incident that resulted in a police report.

Kalish also drank with some of his victims in the parking lot of Devonshire station after his victims had completed their evening shift at the communications division. On one occasion, Kalish became intoxicated and asked another victim, who was an unlicensed 15 year old, to drive him home. Kalish took the same boy to the police academy to watch Kalish complete his monthly firearm qualification, and then bought his victim gifts at the police academy gift shop. At other times, he took the boy to the police academy to play racquetball or jog, after which they showered together, and then Kalish would take the boy home at 3:00 or 4:00 a.m. Kalish showed favoritism to this boy and others, including Doe 1, by buying them LAPD jackets and shirts, some of which were unavailable to the public, and openly giving them these gifts at

Devonshire station. He also showed favoritism by providing "additional ride-alongs, ride-alongs in the downtown patrol division, and commendations."

Doe 1 alleges that other police officers from Devonshire station participated in unauthorized activities and trips with Kalish and Explorer Scouts. Additionally, it was "commonly known" that Kalish traveled to Thailand which is "a known haven for pedophiles." Doe 1 alleges on information and belief that, on one of these trips, other LAPD officers observed Kalish with a young Thai boy.

Doe 1 alleges that on one occasion Kalish molested him at a sanctioned Explorer Scout activity and on another occasion as Kalish was driving Doe 1 home from a sanctioned activity. A third incident occurred at Doe 1's home. Doe 1 was afraid of what would happen to his Explorer Scout career and his hope to become a police officer if he resisted Kalish. Additionally, Kalish had threatened at least one other victim to keep him silent and constantly asked whether that victim had confided in anyone.

On information and belief, Doe 1 alleges that nationwide there have been at least 31 reported incidents of the sexual abuse of Explorer Scouts by police officers participating in the Explorer Scout program. With respect to the Devonshire program, Doe 1 alleges that, prior to the incidents involving Kalish, there were "other instances of misconduct . . . between Advisors and Scouts involving drinking and sexual fraternization" that should have put those in charge of the program on notice of the need to make changes to protect the scouts against sexual exploitation. He alleges further that "other LAPD officers viewed the Explorer/Scout program as a 'time bomb' because of lax supervision and inadequate oversight, the nature of the program, and other known incidents of improper fraternization between officers and scouts."

Based on Kalish's improper conduct with scouts including unauthorized fraternization, favoritism and engaging in prohibited one-on-one contact with targeted scouts, "[d]efendants and each of them knew or should have known that Kalish presented a risk of sexual exploitation to boys in the Devonshire Explorer/Scout program. . . . [¶] Defendants and each of them further knew or should have known that Kalish had a friendship and/or business interests with known pornographer Vince Pirelli, and that Kalish traveled on more than one occasion to Thailand, both of which should have prompted immediate inquiry as the nature of those friendships and trips posed a risk to the young boys in the Explorer/Scouts."

## B. *Doe 2's Complaint*

Doe 2's operative pleading is his first amended complaint. It contains the same causes of action alleged in Doe 1's fourth amended complaint against the same defendants, and its allegations closely track those made in Doe 1's complaint. Like Doe 1, Doe 2 alleges that he was molested by Kalish between 1974 and 1979 while he was a participant in the Explorer Scout program. The complaint also identifies Doe 2 as the other victim referred to in Doe 1's complaint whom Kalish allegedly had drive him home because Kalish was too intoxicated to drive and whom Kalish took to the police academy to watch Kalish complete his monthly firearm qualification and to play racquetball and jog.

Doe 2's complaint contains additional allegations regarding defendants' knowledge. Doe alleges that "BSA knew and the LAPD should have known, prior to the incidents complained of here, that pedophiles were active in its organization and the programs it sponsored." Additionally, Doe 2 alleges on information and belief that "since the early part of the last century—the BSA has maintained 'Confidential Files' on questionable scout leaders, including those suspected of child molestation." The complaint further alleges that since 1971, "more than half of all leaders placed in the Confidential Files have been put there for child abuse," and these statistics "represent only a small number of the suspected pedophiles in the BSA organization." Doe 2 alleges that prior to his molestation by Kalish, "numerous adults in BSA programs, were investigated, arrested and/or tried for child sexual abuse." He alleges further that statistics maintained by BSA since 1980 show "more than one incident of sexual abuse per week for the past two decades involving scouts and scout leaders, that is, more than 1000 reported incidents since 1980." He alleges that BSA knew or had reason to know of comparable numbers of sexual abuse occurring before 1980.

Doe 2 alleges that LAPD and BSA knew or should have known that, prior to Kalish's molestation of Doe 2, "sexual exploitation and sexual abuse of Explorer Scouts had occurred in its Hollywood and Devonshire programs." Specifically, Doe 2 alleges that "in the late 1960's and early 1970's . . . Defendant LAPD knew and Defendant BSA should have known of the following: a) that a police officer was having sex with an Explorer Scout in the Hollywood Division's Explorer Scout Program[;] b) that another two police officers were having sex with a different Explorer Scout in the Hollywood Division's Explorer Scout Program; and c) that another police officer had sex with an Explorer Scout in the Devonshire Division's Explorer Scout Program while on a sanctioned scout camping trip and got her pregnant."

Accordingly, Doe 2 alleges on information and belief that defendants "knew or should have known, prior to the incidents complained of here, that numerous incidents of sexual abuse and sexual exploitation occurred in BSA-sponsored programs and in the LAPD Explorer Scout program; that pedophiles were active in the BSA organization and the programs it sponsored; that the subject Explorer Scout program is a program of such nature so as to create an especial risk of sexual exploitation and sexual abuse to the minor scouts participating in them; that pedophiles seduce their victims in ways similar to that of adults; and that training, education, warnings and supervision would prevent or at least minimize the likelihood of sexual exploitation and abuse."

### C. *The Demurrers*

Both the City and BSA demurred to plaintiffs' operative complaints. As relevant here, BSA argued that the complaints were barred by the statute of limitations, which ordinarily precludes an action against a nonperpetrator defendant after the plaintiff's 26th birthday. BSA acknowledged that section 340.1, subdivisions (b) and (c) revived such actions against a nonperpetrator defendant for a one-year period, but argued that plaintiffs had failed to comply with the statute's knowledge or notice requirements because they had not pled "that Boy Scouts of America knew or had reason to know in advance of unlawful sexual conduct by Kalish and that he was an employee, volunteer, representative, or agent." The City also cited plaintiffs' failure to sufficiently allege knowledge or notice as a ground for its demurrers.

The trial court agreed with defendants and sustained the demurrers without leave to amend.

### D. *The Court of Appeal's Opinion*

Plaintiffs appealed. The Court of Appeal held that plaintiffs' claims were time-barred because plaintiffs had failed to adequately plead that their actions fell within subdivision (b)(2). Because plaintiffs had conceded they were unable to plead that defendants had actual knowledge of Kalish's proclivity for the sexual abuse of minors, the Court of Appeal focused on the sufficiency of the allegations of constructive knowledge. For purposes of the statute, the Court of Appeal defined constructive knowledge in the language of Civil Code section 19, which states: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

Characterizing subdivision (b)(2) as a defense to the statute of limitations, the Court of Appeal stated that plaintiffs were required "to plead *specific* facts

sufficient to bring their actions within subdivision (b)(2)." "The key issue, therefore, concerns the nature of the specific facts that appellants were required to allege to invoke the defense provided by subdivision (b)(2). This poses a question of law, namely, the proper interpretation of a statute." As an exception to the statute of limitations, the Court of Appeal concluded that subdivision (b)(2) should be narrowly construed. "[T]his provision demands awareness—actual or constructive—that the particular individual who is the target of the action committed sexual abuse, and this awareness must be sufficiently firm to warrant removing *that individual* from contact with children." The Court of Appeal concluded further that subdivision (b)(2) "imposes more stringent demands on constructive knowledge than the concept of forseeability ordinarily applicable to negligence claims." Thus, "appellants may not merely allege that respondents knew facts that raised a generalized prospect or possibility of sexual abuse by Kalish. Rather, appellants were obliged to allege in specific terms that respondents knew facts that—if acted upon in a reasonable manner—would have prompted them to investigate Kalish with a thoroughness likely to establish that he had engaged in unlawful sexual abuse."

Applying this standard to plaintiffs' complaints, the Court of Appeal held that they failed to establish the requisite constructive knowledge. The reviewing court stated that the bulk of material allegations "are improperly pled on information and belief." The Court of Appeal acknowledged the principle that allegations on information and belief are proper where the allegations involve matters peculiarly within the knowledge of the defendants. Here, however, it found that, to the extent certain allegations were purportedly commonly known, they were not peculiarly within the knowledge of defendants. Other information and belief allegations, involving facts that may have been peculiarly within the knowledge of defendants, were improperly pled because they were "unsupported by any 'statement of the facts upon which the belief is founded.' " Regarding allegations not founded on information and belief, the Court of Appeal stated that they did no more than "reasonably support the conclusion that LAPD should have made a general inquiry into alcohol- and chore-related misconduct by LAPD officers within the programs, but not that LAPD should have launched an investigation focused on Kalish that would have uncovered his sexual misconduct."

The Court of Appeal affirmed the dismissal of plaintiffs' action. We granted review.

## II. ANALYSIS

Because Does 1 and 2 filed their actions against the City and BSA after their 26th birthdays, their actions are barred by the statute of limitations

unless they can plead that defendants "knew or had reason to know, or [were] otherwise on notice," that Kalish had engaged in "unlawful sexual conduct" and failed "to take reasonable steps, and to implement . . . safeguards, to avoid acts of unlawful sexual conduct in the future" by Kalish. (Subd. (b)(2).)[3] The question here is what the Legislature meant by this statutory language and whether, in light of that meaning, plaintiffs adequately alleged that defendants had knowledge or notice that Kalish had engaged in past unlawful sexual conduct with minors prior to his alleged abuse of them. Because this appeal arises from a judgment of dismissal following the sustaining of demurrers without leave to amend, we " 'give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material facts properly pleaded.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810 [27 Cal.Rptr.3d 661, 110 P.3d 914], quoting *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

A. *The Purpose and Scope of Subdivision (b)(2)*

■ In construing statutory language our objective is to determine and effectuate the Legislature's intent. (*People v. Yartz* (2005) 37 Cal.4th 529, 537 [36 Cal.Rptr.3d 328, 123 P.3d 604].) Such language, however, is construed in the context of the entire law. "Courts properly examine the manifest purpose of the statute as a whole in interpreting its provisions. [Citations.] We examine the history and background of the statutory provision in order to ascertain the most reasonable interpretation of the measure." (*Hellinger v. Farmers Group, Inc.* (2001) 91 Cal.App.4th 1049, 1056–1057 [111 Cal.Rptr.2d 268].)

■ In *Aaronoff v. Martinez-Senftner* (2006) 136 Cal.App.4th 910 [39 Cal.Rptr.3d 137], the court observed that the purpose of subdivision (b)(2) is to target "third party defendants who, by virtue of certain specified relationships to the perpetrator (i.e., employee, volunteer, representative, or agent), could have employed safeguards to prevent the sexual assault. It requires the sexual conduct to have arisen through an exploitation of a relationship over which the third party has some control." (*Aaronoff*, at p. 921.) The language of the provision expressly supports this characterization. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175] ["In interpreting statutes, we follow

---

[3] We do not separately discuss whether plaintiffs' complaints were timely under the one-year revival of the statute of limitations set forth in subdivision (c). Subdivision (c) revives only such actions that are "permitted to be filed pursuant to paragraph (2) of subdivision (b)" (subd. (c)). Therefore, if plaintiffs' complaints were properly dismissed because they were unable to meet the knowledge or notice requirements of subdivision (b)(2), then whether their actions were timely under subdivision (c) is moot.

the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . ."].) Subdivision (b)(2) extends past a plaintiff's 26th birthday claims against a nonperpetrator defendant who is or was in a specified relationship with the perpetrator—"employee, volunteer, representative, or agent"—and who, "knew or had reason to know, or was otherwise on notice" of the perpetrator's "unlawful sexual conduct" and "failed to take" preventative measures to "avoid acts of unlawful sexual conduct in the future" by that perpetrator. The statute's enumeration of the necessary relationship between the nonperpetrator defendant and the perpetrator implies that the former was in a position to exercise some control over the latter.

This interpretation of the statute is also confirmed by a review of the relevant legislative history of Senate Bill No. 1779 (2001–2002 Reg. Sess.) (Senate Bill No. 1779), which added subdivision (b)(2).[4] (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 697 [37 Cal.Rptr.3d 149, 124 P.3d 719] ["Although the plain language of the statutes dictates the result here [citation], legislative history provides additional authority"].) "[Senate Bill No. 1779] is intended to ensure that victims severely damaged by childhood sexual abuse are able to seek compensation from those responsible. . . . [¶] . . . [T]his bill provides that the extended statute of limitations in childhood sexual abuse cases against a third party extends beyond age 26 of the victim, when the third party knew, had reason to know, or was otherwise on notice, of unlawful sexual conduct by the individual and the third party failed to take reasonable steps and to implement reasonable safeguards to avoid future acts of unlawful sexual conduct by that individual. . . . In support of the measure, the author states: [¶] This bill is essential to ensure that victims severely damaged by childhood sexual abuse are able to seek compensation from those responsible. While current law allows a lawsuit to be brought against the perpetrator within three years of discovery of the adulthood aftereffects of the childhood abuse, current law bars any action against a responsible third party entity (such as an employer, sponsoring organization or religious organization) after the victim's 26th birthday. . . . [¶] . . . This arbitrary limitation unfairly deprives a victim from seeking redress, and unfairly and unjustifiably protects responsible third parties from being held accountable for their actions that caused injury to victims." (Assem. Floor Analysis of Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 17, 2002, pp. 3–4.)

---

[4] Plaintiffs, BSA and the Roman Catholic Archbishop of Los Angeles have all asked that we take judicial notice of the legislative history of Senate Bill No. 1779. "Because the [legislative history] materials are relevant to a material issue in this case, we grant the request." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [104 Cal.Rptr.2d 377, 17 P.3d 735].) Plaintiffs also request that we take judicial notice of the Court of Appeal's file in *McVeigh v. Doe 1* (2006) 138 Cal.App.4th 898 [42 Cal.Rptr.3d 91], and portions of the legislative history of Senate Bill No. 108 (1989–1990 Reg. Sess.). Plaintiffs fail to demonstrate the relevance of this material. We deny their request.

Clearly then, the Legislature's goal in enacting subdivision (b)(2) was to expand the ability of victims of childhood abuse to sue those responsible for the injuries they sustained as a result of that abuse. This reading of subdivision (b)(2) is also consistent with the Legislature's larger purpose in enacting section 340.1, the limitations statute of which subdivision (b)(2) is a part. "The overall goal of section 340.1 is to allow victims of childhood sexual abuse a longer time period in which to bring suit against their abusers. [Citation.] The legislative history makes this abundantly clear. The statute has been amended numerous times since its enactment in 1986, to enlarge the period for filing claims, ' "to hold molesters accountable for their behavior so that they are not 'off the hook' as soon as their victims reach age 21" ' [citations] [and] to extend the expanded limitations period to actions not just against molesters, but against 'any person or entity who owed a duty of care to the plaintiff, where a wrongful or negligent act by that person or entity was a legal cause of the childhood sexual abuse . . .' [citations] . . . . [Citation.] Each time, plaintiffs' access to the courts was expanded." (*McVeigh v. Doe 1*, *supra*, 138 Cal.App.4th at pp. 903–904; see *Shirk v. Vista Unified School Dist.* (2007) 42 Cal.4th 201, 207–208 [64 Cal.Rptr.3d 210, 164 P.3d 630] [review of the history of § 340.1 from its original enactment in 1986 through its 2002 amendments demonstrates a continual expansion and enlargement of the statute to allow sexual abuse victims to sue perpetrators and nonperpetrator defendants].)

■ One caveat applies, however—in construing this, or any statute, we may not broaden or narrow the scope of the provision by reading into it language that does not appear in it or reading out of it language that does. "Our office . . . 'is simply to ascertain and declare' what is in the relevant statutes, 'not to insert what has been omitted, or to omit what has been inserted.' " (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 573 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) " ' "[A] court . . . may not rewrite the statute to conform to an assumed intention which does not appear from its language." ' " (*In re Hoddinott* (1996) 12 Cal.4th 992, 1002 [50 Cal.Rptr.2d 706, 911 P.2d 1381].)

■ With these principles in mind, we turn to subdivision (b)(2). The words of subdivision (b)(2) create three conditions that must be met before it applies to a particular case: (1) the nonperpetrator defendant "knew or had reason to know, or was otherwise on notice"; (2) that the perpetrator—"an employee, volunteer, representative, or agent"—had engaged in "unlawful sexual conduct"; and (3) "failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person, including, but not limited to, preventing or avoiding place-ment of that person in a function or environment in which contact with children is an inherent part of that function or environment." Moreover, the "unlawful sexual conduct" refers to the acts specified in section 340.1,

subdivision (e), which defines " '[c]hildhood sexual abuse' " in terms of seven provisions of the Penal Code describing various prohibited sexual acts against minors.

■ Although plaintiffs are focused on the words "knew," "reason to know," and "otherwise on notice" in the statute, it bears emphasizing that these words must, of course, be read in the context of the provision as a whole. Thus, the subject of which the nonperpetrator defendant must have had knowledge or notice is, the statute clearly tells us, the perpetrator's *unlawful sexual conduct* as that term is defined in the statute to encompass particular prohibited sexual acts with a minor. As we shall demonstrate, it is the failure of plaintiffs to allege that either the City or the BSA had knowledge or notice that Kalish had engaged in past unlawful sexual conduct that dooms their complaint. Bearing this in mind, we turn to the knowledge and notice language.

The words "knew," "reason to know," and "otherwise on notice" are not defined in the statute. The parties agree that "knew" refers to actual knowledge. They agree further that the phrase "reason to know" refers to a species of constructive knowledge, but they disagree as to its exact type.

In their briefing, plaintiffs argued that the phrase imposes a duty of inquiry, a view shared by the Court of Appeal, which defined the phrase in the language of Civil Code section 19: "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." In plaintiffs' view, the allegations in their complaints that defendants were aware of circumstances that, if investigated, would have revealed Kalish was a child molester are sufficient to charge defendants with constructive knowledge of that fact. At argument, however, plaintiffs appeared to back away from the position and to agree that "reason to know" in the statute has the same meaning we ascribed to that term in *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1191 [45 Cal.Rptr.3d 316, 137 P.3d 153]. (See, *post*, at p. 547.) They shifted their argument regarding the inquiry notice to the "otherwise on notice" language, a point we take up momentarily.

BSA, however, maintains that "reason to know" is a form of "presumed actual knowledge" where "based on facts defendant *actually* knew, an inference can be drawn that he/she *must* have realized child abuse was occurring, because a reasonable person *would* have realized this under the

circumstances." Accordingly, in BSA's view, the constructive knowledge requirement in subdivision (b)(2) refers not to facts defendants could have discovered upon inquiry, but facts they actually knew and from which known facts they could reasonably have inferred the ultimate fact of Kalish's deviant propensities.

■ We recently had occasion to discuss the meaning of "reason to know." "Under the reason-to-know standard, 'the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.' (Rest.2d Torts, § 12, subd. 1.) In other words, 'the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist.' (*Id.*, § 12, com. a, p. 20.)" (*John B. v. Superior Court, supra,* 38 Cal.4th at p. 1191, fn. omitted.)

Thus, contrary to plaintiffs' argument, and the conclusion of the Court of Appeal, the Legislature's use of a "reason to know" standard is not the same as the inquiry notice described in Civil Code section 19. Rather, in determining whether an actor was in possession of the constructive knowledge described by the "reason to know" standard, we ask whether, after examining the facts in the actor's possession, a reasonable person of ordinary intelligence—or, in the particular circumstance, a person of superior intelligence—would have inferred the existence of the ultimate fact at issue or regarded its existence as so highly probable as to conduct himself or herself as if it did exist.

■ Nonetheless, contrary to BSA's formulation, having a "reason to know" something is not the same as actual knowledge. In light of the Legislature's explicit inclusion of an actual knowledge standard, to construe the "reason to know" standard as simply a restatement of actual knowledge impermissibly creates surplusage in the statute. "We must, of course, avoid any construction that would create such surplusage." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 95 [124 Cal.Rptr.2d 530, 52 P.3d 703].) ■ A "reason to know" standard does not require proof that a person *must* have inferred the existence of the ultimate fact but only, under the circumstances described above, that a person *would* have inferred the existence of the ultimate fact or *would* have regarded the existence of the ultimate fact as so highly probable as to have behaved in conformity with that belief.

The parties also disagree about the meaning of the phrase "otherwise on notice." Plaintiffs argue that the phrase, juxtaposed "against actual notice and inquiry (i.e. constructive) notice . . . is reasonably interpreted as an even broader form of constructive knowledge," that "encompasses facts and behaviors inconsistent with the protection of minors, while not fully rising to the level of 'childhood sexual abuse,' as that term is defined in subdivision (e) of § 340.1." Thus, as plaintiffs made clear at argument, it is their position that "otherwise on notice" imposes a duty of inquiry on nonperpetrators triggered when, in the words of their brief, the nonperpetrator is in possession of "facts [that] suggest the minor was at risk." At that point, according to plaintiffs, "the policy must be for non-perpetrator defendants to have reasonably reacted to that risk and determined its nature and scope." This position is consistent with their pleadings in which, in Doe 1's complaint, for example, it is alleged that, based on the various types of improper conduct by Kalish, that "[d]efendants and each of them knew *or should have known* that Kalish presented *a risk of sexual exploitation* to boys in the Devonshire Explorer/Scout program." (Italics added.)

BSA, by contrast, argues that "otherwise on notice" means imputed actual notice—that is, actual knowledge imputed to a principal based on actual or constructive knowledge, including both inquiry notice and reason to know, in the possession of the principal's agent.

■ Because the phrase is admittedly ambiguous, we consult the legislative history. (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57] ["[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including . . . the legislative history . . . ."].) "The language 'or was otherwise on notice' was added . . . to address a concern that an entity might be able to avoid responsibility if a formal complaint had not been filed." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 6, 2002, p. 10.) The apparent purpose of this language was to prevent a nonperpetrator defendant from disclaiming knowledge of the unlawful sexual conduct of the perpetrator on the grounds that it had not been notified of this conduct through a formal complaint process where the evidence demonstrates that some other form of notice was provided.

Thus, the legislative history does not support either plaintiffs' claim that the "otherwise on notice" language imposes a duty of inquiry or BSA's claim that what the Legislature intended was imputed actual knowledge. We need not determine the precise contours of the phrase, however, because even if we were to assume arguendo that plaintiffs' interpretation is tenable, they have failed to satisfy the further requirement that the nonperpetrator defendant have knowledge or notice of the perpetrator's past unlawful sexual conduct.

It is not enough, under the statute, as plaintiffs maintain, that knowledge or notice of conduct that does not amount to unlawful sexual conduct is sufficient to trigger a duty of inquiry, even if we assume that "otherwise on notice" refers to such a duty. The preliminary reference in subdivision (b)(2) to "unlawful sexual conduct by an employee, volunteer, representative, or agent," is clarified by the subsequent language regarding the nonperpetrator defendant's failure to take preventative action "to avoid acts of unlawful sexual conduct *in the future by that person*, including, but not limited to, preventing or avoiding placement *of that person*" in circumstances involving contact with children. (Italics added.)

Thus, construing the subdivision as a whole, the knowledge or notice requirement refers to knowledge or notice of *past* unlawful sexual conduct by the individual currently accused of other unlawful sexual conduct. Again, this construction of the statute is supported by the legislative history. In an analysis of the policy reasons supporting Senate Bill No. 1779, it was noted: "According to the proponents, many of the victims that would be covered under this bill were abused for years during their childhood, enduring hundreds of assaults from employees or agents that the employer knew or had reason to know had committed *past* unlawful sexual conduct but failed to take reasonable steps to prevent *future* occurrences." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 6, 2002, p. 9, italics added.)

Fairly construed, then, subdivision (b)(2) requires the victim to establish that the nonperpetrator defendant had actual knowledge, constructive knowledge (as measured by the reason to know standard), or was otherwise on notice that the perpetrator had engaged in past unlawful sexual conduct with a minor and, possessed of this knowledge or notice, failed to take reasonable preventative steps or implement reasonable safeguards to avoid acts of future unlawful sexual conduct by the perpetrator.

B. *Are Plaintiffs' Pleadings Sufficient to Satisfy the Knowledge or Notice Requirements of Subdivision (b)(2)?*

Preliminarily, the parties disagree as to the level of specificity required of plaintiffs' knowledge and notice pleadings. Characterizing subdivision (b)(2) as a "defense" to the statute of limitations, the Court of Appeal held that plaintiffs must allege specific facts, although it did not explain what this entailed. Defendants adopt this position. Plaintiffs, by contrast, contend that the doctrine of "less particularity" applies to the knowledge and notice pleadings. This doctrine provides that "[l]ess particularity [in pleading] is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues

sufficient to enable preparation of a defense." (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458 [175 Cal.Rptr. 157, 629 P.2d 1369].) Thus, plaintiffs contend that "pleading ultimate facts is sufficient since the particularized knowledge lies with the defendant and the defendant does not need more information for evaluation of the action brought against it."

■ We disagree with any implication in the Court of Appeal's analysis that plaintiffs seeking the shelter of subdivision (b)(2) are required to plead evidentiary, as opposed to ultimate facts, and may not include allegations based on information and belief. Contrary to the Court of Appeal's characterization, the subdivision is not a defense to a statute of limitations but, as we have observed, an expansion of the limitations period, the purpose of which is to expand access to the courts by victims of childhood sexual abuse. (*McVeigh v. Doe 1, supra*, 138 Cal.App.4th at pp. 903–904.) It would be inconsistent with this purpose, or with the mandate to broadly construe these provisions, to apply more stringent rules of pleading than those that ordinarily apply. (See § 425.10, subd. (a) [a complaint is sufficient if it contains "[a] statement of the facts constituting the cause of action, in ordinary and concise language"].) Thus, the complaint ordinarily is sufficient if it alleges ultimate rather than evidentiary facts. (*Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 473–474 [20 Cal.Rptr. 609, 370 P.2d 313]; *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099 [34 Cal.Rptr.3d 157] ["It has been consistently held that ' "a plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action" ' "].) Moreover, "[p]laintiff may allege on information and belief any matters that are not within his personal knowledge, if he has information leading him to believe that the allegations are true." (*Pridonoff v. Balokovich* (1951) 36 Cal.2d 788, 792 [228 P.2d 6].)

Furthermore, we agree with plaintiffs that the doctrine of less particularity may be especially appropriate in this setting. The legislative history of Senate Bill No. 1779 demonstrates the Legislature was particularly sensitive to cases of childhood sexual abuse in which the nonperpetrator defendant concealed from victims of that abuse its knowledge of the perpetrator's past acts of unlawful sexual conduct. "[C]laims of some victims were delayed because the employer withheld information from victims or lied to victims so the employer's negligence and wrongful conduct would not be discovered. This is a key distinction and policy justification for holding these wrongdoing employers liable past the victim's 26th birthday. In these cases, the evidence is not lost because the perpetrator of the abuse could not be found or his memories faded. Instead, the evidence is in the possession of the wrongdoing employer or third party, who knew or had reason to know of complaints of sexual misconduct against the employee or agent but failed to take reasonable

steps to avoid future unlawful acts by that employee or agent." (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 1779 (2001–2002 Reg. Sess.) as amended June 6, 2002, p. 9.)

 This recognition by the Legislature that one reason a plaintiff may remain ignorant of the nonperpetrator defendant's wrongdoing is because that defendant has withheld or concealed evidence of its wrongdoing argues strongly in favor of broader, rather than more restrictive, standards of pleading where subdivision (b)(2) is alleged to apply. In the appropriate case, a plaintiff should be able to rely on the doctrine of less particularity where he or she can plausibly allege that the nonperpetrator defendant withheld or concealed evidence of its knowledge or notice of the perpetrator's past unlawful sexual conduct with minors.[5]

Nothing in the foregoing discussion, however, assists these plaintiffs because no degree of broad construction of their pleadings can supply what is missing from them—allegations that defendants knew, had reason to know, or were otherwise on notice of *past incidents of unlawful sexual conduct* by Kalish with minors that triggered the duty on defendants' part to take preventive measure to avoid acts of unlawful sexual conduct by Kalish in the future.

Plaintiffs' repetitive and rambling allegations regarding the knowledge or notice requirement can be distilled into five categories. First, there are numerous allegations to the effect that defendants inadequately supervised the Explorer Scout program at Devonshire station during the time period that plaintiffs participated in the program and, as a result, it was staffed by unqualified officers who engaged in improper activity with the participants. Second, there are general allegations that the BSA was aware of past incidents involving sexual molestation of scouts by scout leaders along with more specific allegations that, prior to Kalish's molestation of plaintiffs, defendants were aware of incidents of sexual misconduct by other officers involved in the Explorer Scout programs at the Hollywood and Devonshire stations. Third, there are general allegations that BSA was aware that sexual

---

[5] On the other hand, the pleading must conform to "the general rule that a complaint must contain only allegations of ultimate facts as opposed to allegations of . . . legal conclusions . . . ." (*Burke v. Superior Court* (1969) 71 Cal.2d 276, 279, fn. 4 [78 Cal.Rptr. 481, 455 P.2d 409].) Thus a pleading that did no more than assert boilerplate allegations that defendants knew or were on notice of the perpetrator's past unlawful sexual conduct would not be sufficient nor would allegations of information and belief that merely asserted the facts so alleged without alleging such information that "lead[s] [the plaintiff] to believe that the allegations are true." (*Pridonoff v. Balokovich, supra*, 36 Cal.2d at p. 792.)

predators were active in its programs. In this connection, plaintiffs allege that there were significant reported incidents of sexual misconduct by scout leaders after 1980 from which they infer that a comparable number of such incidents was known to the BSA before 1980. Fourth, there are allegations that other police officers were aware of Kalish's pedophilic tendencies—these are the "commonly known" allegations—because of his open interest in young boys, the favoritism he showed to certain of the scouts, including plaintiffs, his inappropriate fraternization with some scouts, including plaintiffs, both on the job and at his home, his alleged association with a known pornographer, and his trips to Thailand, where he was observed in the company of a young boy, among other allegations. Fifth, there are the allegations pertaining to Kalish's molestation of plaintiffs while he was on duty.

 Plaintiffs argue that these allegations satisfy the knowledge or notice requirement of subdivision (b)(2) because that subdivision requires nothing more than constructive knowledge or notice by the nonperpetrator defendant of a single incident of sexual misconduct "no matter how minor," by "*any* of [the nonperpetrator defendant's] employees, volunteers, representatives or agents" to "subject [the defendant] to the provisions of subdivision (b)(2)." This argument, however, wrenches out of context particular words in the provision—"*any* unlawful sexual conduct by *an* employee, volunteer, representative, or agent"—in a manner incompatible with the principles of statutory construction to which we have previously referred and also with the legislative intent behind the subdivision as expressed in the plain language of the statute and the legislative history. Plaintiffs' argument impliedly concedes what is plain on the face of their complaints: that their complaints fail to allege that defendants had knowledge of Kalish's past unlawful sexual conduct with minors, which is the prerequisite for imposing upon these defendants liability for his subsequent sexual abuse of plaintiffs. That defendants had knowledge or notice of misconduct by Kalish that created a risk of sexual exploitation is not enough under the express terms of the statute. In the absence of sufficient allegations of knowledge or notice on the part of these defendants, their demurrers were correctly sustained and the actions against them properly dismissed.[6]

---

[6] We are not persuaded by plaintiffs' claim that the requirement of a certificate of corroborative fact set forth in section 340.1, subdivisions (m) and (n) has any bearing whatsoever on the pleading requirements for subdivision (b)(2). The former subdivisions—which, collectively, require that a plaintiff submit a certificate of corroborative fact before the court allows substitution of a named defendant for a Doe defendant—are, along with the certificate of merit requirement in section 340.1, subdivision (h), statutory safeguards that operate to prevent "frivolous and unsubstantial claims." (*McVeigh v. Doe 1, supra,* 138 Cal.App.4th at p. 904.)

## III. DISPOSITION

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.