Filed 12/17/20  P. v. Richard CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>EMILE RICHARD,<br><br>　　　Defendant and Appellant. | A158285<br><br>(Solano County<br>Super. Ct. No. FCR343258) |

A jury convicted Emile Richard of battery against a girlfriend or child's parent and making criminal threats.  He contends the court abused its discretion when it admitted evidence of four uncharged acts of domestic violence, failed to instruct the jury sua sponte on attempted criminal threats as a lesser included offense, and imposed a domestic violence protective order as to his daughter.  He also raises several sentencing issues, which the People acknowledge require correction.  There was no prejudicial error at his trial, so we correct the sentence and affirm the judgment in all other respects.

**BACKGROUND**

T.O. and Richard lived together on and off for 20 years and had two children. On September 12, 2018, they argued over whether Richard could take the couple's nine-year-old daughter E.R. for two days without telling T.O. where they would be.  Richard picked E.R. up and tried to leave the

1

apartment when T.O. tried to grab the child from him. Richard punched T.O. in the face three or four times with both fists, knocking her to the ground and blackening her eyes. Before fleeing the apartment, he said, " 'I told you I would go for blood if you tried to stop me this time.' "

A little more than two months later, on November 22, 2018, Richard accused T.O. of not listening to him and struck her on the mouth. Shortly afterwards Richard called E.R. and the couple's 19-year-old son, T.R., into a bedroom and proceeded to make a lengthy videotaped statement to his family—a diatribe that included statements about killing T.O. and T.R.

Around five days later Richard grabbed T.O.'s phone, used it to post derogatory comments on her Facebook account, and threatened to punch her if she tried to get the phone back. When T.O. used her laptop to block him from accessing her account Richard charged at her and punched her, leaving a bruise on her leg. After this incident, T.O. "wound up leaving home. [¶] . . . [¶] [b]ecause at that point I figured that this would never stop, the cycle would never stop. So I decided to leave." She later called the police and applied for a restraining order against Richard. The day after the restraining order was served, Richard sent the video recording he made on November 22 to family members and the video appeared on his Facebook account.

Richard was charged with inflicting corporal injury on a spouse causing a traumatic condition on September 12 (Count 1) and November 22 (Count 5); two counts of making criminal threats (Counts 2 and 3, as to T.O. and T.R., respectively) on November 22; one count of battery on a girlfriend or child's parent (Count 4), related to the November 22 incident; and one count of disobeying a domestic relations court order (Count 6). The information alleged enhancements for two prior prison terms pursuant to Penal Code section 667.5, subdivision (b).

2

The jury acquitted Richard on Counts 1 and 5, but found him guilty of the lesser included offense of battery against a girlfriend or child's parent on each count. Richard was also found guilty of criminal threats against T.R. (Count 3) but not guilty on the Count 4 battery charge and disobeying a domestic relations court order. The Count 2 criminal threats charge was dismissed after the jury was unable to reach a verdict on it. The court found the two prior prison term allegations true.

Richard was sentenced to a six-year prison term composed of the three-year upper term on the criminal threats conviction, two consecutive one-year terms on the enhancements, a consecutive one-year term on the Count 1 conviction for battery on a girlfriend or child's parent, and a concurrent six-month term on the Count 5 conviction for the same offense. The court imposed a 10-year domestic violence restraining order protecting T.O., T.R. and E.R.

This appeal is timely.

## DISCUSSION

### I. Admission of Uncharged Domestic Violence Evidence

Richard contends the court prejudicially abused its discretion when it admitted evidence of four uncharged incidents of domestic violence as propensity evidence pursuant to Evidence Code section 1109[1] because its "slight probative value . . . was substantially outweighed by undue prejudice."

---

[1] The court also ruled the evidence admissible under Evidence Code section 1101, subdivision (b) to show the specific intent for the criminal threat charge and the reasonableness of T.O.'s fear for purposes of the criminal threat charge. Richard does not challenge that ruling on appeal, but we address the ruling under section 1109 because it allowed the jury to consider the uncharged acts as propensity evidence.
Unless otherwise noted, further statutory citations are to the Evidence Code.

3

We disagree. The decision to admit the uncharged acts evidence was within the court's broad discretion in this area.

## A. Background

The oldest of the uncharged acts occurred in 2001 during an argument over who would use the couple's car that day. T.O. tried to block Richard from leaving the apartment. They scuffled. Richard pushed T.O. and punched her in the face.

In 2004, during another argument, Richard pushed T.O. down and punched her.

Sometime between 2007 and 2010 T.O. tried to prevent Richard from leaving their apartment because she was worried about him getting into trouble on the streets. Richard punched her in the mouth and knocked out one of her teeth.

In 2011 T.O. tried to leave the couple's apartment during another argument. Richard pushed her down onto a couch and hit her. T.O. reached for the phone to call 911, but Richard pulled the phone cord out of the wall. T.O. eventually managed to escape to her cousin's nearby apartment. T.O. and Richard briefly broke off their relationship after this last incident, but got back together after Richard promised that "these things weren't going to happen again; that he was sorrowful for what he had did and he wouldn't place hands on me again."

Licensed marriage and family therapist Dr. Linda Barnard testified as an expert in the field of domestic violence and intimate partner battering. About two thirds of violent relationships involve a "cycle of violence" in which an initial tension is followed by an acute episode of physical or escalating psychological violence and, ultimately, by a "honeymoon" period where the abuser promises to get help and reform. For the victim, in the initial stage

4

"there's some denial and minimizing and hoping this isn't going to happen again and believing maybe it won't. And then as things start to happen to show that things are going to get bad again, there's anxiety and tension and fear. And then when there's an actual episode, there's usually a lot of fear, because the victim has no way to know how long it's going to last, how bad it will be, if they will be physically seriously harmed or even killed. And then during the honeymoon stage, there's back to that denial, disbelief, wanting to believe it won't happen again, some anxiety mixed in there with some fear, but primarily a lot of denial." This cycle repeats itself throughout the relationship.

Richard argued the evidence of uncharged domestic violence should be excluded under section 352 because the incidents were remote in time, uncorroborated, cumulative, and unduly prejudicial. The prosecutor argued that "remoteness would usually be a pretty strong argument for the defense. But I don't think it is in this case because of the dynamics of the relationship between these two. Because they've been together so long and she's been a victim of domestic violence on multiple occasions throughout the relationship. I think the remoteness of the incident is actually very important for this case and very important for the jury to hear, in that she's been going through this for so long. [¶] In terms of the corroboration argument posited by the defense, I think that would certainly go to the weight of the evidence, that the defense is free to argue to the jury."

The court allowed the prosecution to introduce the evidence under section 1109. Citing *People v. Kerley,* (2018) 23 Cal.App.5th 513 (*Kerley*), it observed that, despite the remoteness of the older uncharged acts, their very frequency contributed to their weight as proof of propensity. Moreover, the incidents were very similar and the type of event that usually occurs without

witnesses.  "So I just think, overall, there's not undue prejudice.  It's not cumulative.  And in the interests of justice, those earlier incidents can be proven up under 1109."

### *B. Analysis*

*Kerley, supra,* 23 Cal.App.5th 513, states the controlling principles. Although propensity evidence is generally inadmissible to prove the defendant's disposition to commit a charged offense, section 1109 carves out one of several established exceptions.  In criminal actions involving domestic violence, "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.' [Citation.]  '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] As a result, section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]'  [Citation.] Section 1109 'reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation.' [Citation.]" (*Id*. at p. 531.)  But older domestic violence incidents are subject to a stricter standard.  Under section 1109, subdivision (e), "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

Section 1109 expressly incorporates the limitations of section 352. Before admitting evidence under section 1109 the trial court must exercise its discretion to determine whether the probative value of the evidence is "

6

'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Kerley, supra,* 23 Cal.App.5th at p. 532.)

" '[U]ndue prejudice,' as used in section 352, however, does not mean evidence that is harmful to the defendant's case. ' " ' "[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " ' [Citation.] [¶] ' "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Kerley, supra,* 23 Cal.App.5th at p. 532.)

There was no abuse of discretion here. Richard argues there is no indication the court applied the appropriate "more rigorous standard of admissibility" (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539 (*Johnson*)) to the three uncharged acts that were more than 10 years old. He argues all the incidents lacked probative value because, separated by gaps of at least three years and spread out over a ten-year period, they "were not consistent, regular, and without significant temporal gaps." He further notes that the

7

gaps between incidents grew longer over time, arguing that this distinguishes his case from the " 'escalating pattern of domestic violence' the Legislature contemplated when enacting Evidence Code section 1109." And he maintains the uncharged conduct evidence had little probative value because T.O.'s testimony was uncorroborated.

The trial court's decision to admit this evidence was well within its discretion, including the three uncharged incidents that were subject to section 1109, subdivision (e)'s qualification that evidence of domestic violence that occurred more than 10 years before the charged offense is inadmissible unless the trial court determines its admission is in the "interest of justice." (*Johnson, supra,*185 Cal.App.4th at pp. 537-540.) The statute "clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*Id.* at p. 539.) "To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e). Under subdivision (a)(1) and section 352, evidence may be excluded only where its probative value is 'substantially outweighed' by its prejudicial effect. Though it reversed the presumption in subdivision (e), we believe the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales." (*Ibid*.) "Thus, the 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*Id.* at pp. 539-540; *People v. Megown* (2018) 28 Cal.App.5th 157, 168 (*Megown*).)

Richard is mistaken to suggest the court failed to apply this standard to the three older incidents. The prosecutor argued that "some of these acts

are older than ten years, so that would require the Court to find that the admission of the evidence is in the interest of justice." In ruling, the trial court cited *Johnson, supra,* 185 Cal.App.4th 520, and expressly found the evidence to be admissible "in the interests of justice." The trial court clearly applied the standard required by subdivision (e).

Nor did the court abuse its discretion when it found the evidence more probative than prejudicial. " 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) " '[I]n domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the "typically repetitive nature" of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.' " (*Megown, supra,* 28 Cal.App.5th at p. 168.) Here, the prior episodes of domestic violence were similar to each other and the charged acts. The court reasonably found the similarity between the incidents and their repetition over many years created a strong inference that Richard had a propensity to commit the charged acts. Richard further argues the evidence was improperly cumulative, but in the context of these "typically repetitive" offenses, the court could reasonably consider their cumulative nature as more, not less, probative as propensity evidence.

Relying heavily on *People v. Stanley* (1967) 67 Cal.2d 812 (*Stanley*), Richard argues the uncharged acts evidence was inadmissible because T.O.'s testimony was uncorroborated. But *Stanley* was superseded by the enactment of section 1101, subdivision (b) and substantially clarified by the Supreme Court in *People v. Ewoldt* (1994) 7 Cal.4th 380, 407-408 (*Ewoldt*)

9

[noting that *Stanley* expressly declined " 'to adopt rigid rules' " regarding the admission of uncorroborated prior conduct evidence].) As the Court directed in *Ewoldt*, independently corroborated testimony may be more probative than uncorroborated testimony, but it misstates the law to suggest a complaining witness's uncorroborated testimony has no probative value. (*Id*. at p. 407.) Rather, "the probative value of this evidence must be considered by the trial court in conducting the weighing process mandated by Evidence Code section 352." (*Id*. at pp. 407-408.)

Richard also contends the uncharged acts were not probative because they did not demonstrate an *escalating* pattern of frequency, regularity and severity. Here, too, we disagree. True, the legislative history indicates the likelihood of such escalation was one of the concerns addressed through section 1109. As stated in an assembly committee report, " 'Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) But the Legislature did not limit admissibility under section 1109 to only those uncharged acts that show a pattern of increasing severity and frequency, and it is beyond our purview to do so. (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545 [ " ' "[A] court . . . may not rewrite

10

the statute to conform to an assumed intention which does not appear from its language." ' "].)  Rather, express incorporation of section 352 as the standard for weighing prior acts tells us that such a pattern of escalation is but one factor to be weighed when courts balance probative value against potential for undue prejudice.  There is no reason to believe the court here did not do so.

## II.  Failure to Instruct on Attempted Criminal Threats

Richard was convicted on Count 3 for making criminal threats against T.R. during the November 22, 2018 incident.  He asserts T.R.'s preliminary hearing testimony that he was not actually frightened by his father's threats required the trial court to sua sponte instruct the jury on attempted criminal threat as a lesser included offense.  "[I]f a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat."  (*People v. Toledo* (2001) 26 Cal.4th 221, 231.)

We need not decide whether the instruction was required because, assuming it was, it is not reasonably probable the jury would have found Richard guilty only of attempted criminal threat had it been so instructed. (See *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*); *People v. Breverman* (1998) 19 Cal.4th 142 (*Breverman*).)  "[T]he sua sponte duty to instruct on a lesser included offense arises if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense. [Citation.]  This standard requires instructions on a lesser included offense whenever ' "a jury

11

composed of reasonable [persons] *could . . . conclude*[]" ' that the lesser, but not the greater, offense was committed. [Citation.] In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight. [Citation.]" (*Breverman, supra,* 19 Cal.4th at p. 177.)

But "[a]ppellate review under *Watson* . . . takes an entirely different view of the evidence. Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. . . . Application of the *Watson* standard of appellate review may disclose that, though error occurred, it was harmless." (*Breverman, supra,* 19 Cal.4th at pp. 177-178.) Therefore, assuming the omission was error, Richard's conviction of criminal threats may be reversed only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" he would have obtained a more favorable outcome had the court instructed the jury on the attempt offense. (*Id.* at p. 178.)

No such probability is evident here. Richard's position is pinned on his son T.R.'s preliminary hearing testimony, brought up during his trial testimony, that Richard's statements did not actually frighten him. But that testimony is notably weak when compared to the evidence that Richard's threats in fact caused T.R. to experience the sustained fear required for conviction of criminal threats. (See *People v. Solis* (2001) 90 Cal.App.4th

12

1002, 1024 ["sustained fear 'means a period of time that extends beyond what is momentary, fleeting or transitory' "].)

T.R. testified at trial that he was present in the bedroom when Richard, on tape, threatened to kill T.O. Richard told him, " 'Just know this. When she die, you die. Just know that. Ain't going to let you snitch me out.' " This made T.R. feel "[a] little scared." He had seen Richard use violence against T.O. before. Although he did not know if his father "was actually planning on doing it," he believed "possibly what he was saying was actually true. . . about killing us." (RT 335-337)~ The jury saw Richard's video recording of those statements.

Richard also said, " 'I should kill his [meaning T.R.'s] ass now, really. You feel me? To tell you the truth, if he was a real street,' N word, 'I would kill these—kill him right now, get him out of the way fast, because he's a threat.' " This frightened T.R. because he thought Richards "was going to . . . kill me." T.R. remained in the apartment after that because he was afraid Richard would do something to T.O. and that he might get violent if police were called.

On cross-examination, T.R. acknowledged his preliminary hearing testimony that he "felt skeptical" when Richard threatened him and his mother, and that he was not sure at the time if Richard was serious. But he confirmed on redirect that he *also* testified in the preliminary hearing that he "fe[lt] fear in that moment" when Richard said, " 'Just know this, when she die, you die' ." Further, he clarified that while he was initially "skeptical" when Richard talked about killing T.O. and asked if T.R. would testify against him, "the more it kind of sunk in, the more I started thinking about it, the more scared I was getting." The trial court confirmed this at sentencing, when it commented that " [o]ne of the things I remember is the—

13

I'll call it the transformation of [T.R.] on that video when the defendant first started talking to when he finished. You could see from his facial expressions how the nature of the statements was starting to sink into him. Just from his body language and his demeanor."

T.R. also testified at the preliminary hearing that he was "actually not scared [¶] . . . [¶] at that moment" when Richard was threatening the family. But he explained this testimony during the trial. "Q: [Prosecutor]: Do you remember those questions by the defense attorney? [¶] A. Yes. [¶] Do you remember him asking the next question, 'Okay. And in that moment, you weren't fearful, right?' [¶] And you answered, 'About the future, yes.' [¶] Right? A: Yes. [¶] So can you clarify, then, right now: When the defendant made those threats to you, were you scared of what he might do? [¶] A. Yes, I was. At that moment, I didn't—at that exact moment he said it, I didn't think he was going to get up and do it right at that second, no. But, yes, I was in the future, yes. [¶] Q. You were concerned about what in the future happening? [¶] A. That he was going to kill us. [¶] Q. Kill you and [T.O.]? [¶] A. Yes, just not at that right second. [¶] Q. Not right then when he said it? [¶] A: Yeah, yes."

On this record there is no reasonable probability the jury would have found T.R. did not experience fear as a result of Richard's threats. Nor is it reasonably probable they would have convicted Richard only of attempted criminal threats if the court had instructed them on the lesser offense. The question is not "what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman, supra,* 19 Cal.4th at p.177.) The evidence that T.R. was in fact frightened by his father's threats was strong, and the evidence that he was not frightened, consisting of his ambiguous statements from the preliminary

14

hearing that he consistently and plausibly explained at trial, was not. Error in failing to instruct sua sponte on attempted criminal threats, if any, was harmless.[2]

### III. Domestic Violence Protective Order

Richard contends the 10-year protective order imposed at sentencing must be reversed as to E.R., because there was no evidence his daughter was a "victim" of any crime within the meaning of Penal Code section 136.2, subdivision (i)(1). He is wrong.

As relevant here, the statute authorizes a postconviction protective order where "the crime qualifies as a 'domestic violence' crime" and "the protected person qualifies as a 'victim.' " (*People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 466.) A "victim" is defined as "any natural person with respect to whom there is reason to believe that any crime . . . is being or has been perpetrated or attempted to be perpetrated." (Pen. Code § 136, subd. (3).) In this context, the term is broadly construed "to include any individual against whom there is 'some evidence' from which the court could find the defendant had committed or attempted to commit some harm within the household." (*People v. Race* (2017) 18 Cal.App.5th 211, 219.) Evidence of domestic violence committed in the presence of a child may establish the child has been harmed. (*Id. at pp.* 216, 220; *People v. Clayburg* (2012) 211 Cal.App.4th 86, 88 [order issued pursuant to similar statute barred contact with named victim's daughter, who witnessed defendant's verbal attacks and vandalism and was emotionally harmed].)

Richard claims the postconviction protective order must be reversed because "[a]lthough the definition of victim under section 136.2 is broad, it

---

[2] To be clear, we reach no conclusion as to whether the lack of an instruction on the lesser included offense was error.

15

does not include a person, like ER, who merely witnessed a domestic violence offense." Not so. T.O. testified that on September 12, 2018, with E.R. in his arms, Richard punched T.O. in the face multiple times, inflicting two black eyes, and attempted to leave the apartment with his daughter. He said, " 'I told you I would go for blood if you tried to stop me this time.' " E.R. was crying. Two months later, when Richard (on videotape) threatened the life of E.R.'s mother and brother, he urged the nine-year-old child to take his side if he followed through on his threats: "[Richard]: You snitchin' on me too, [E.R.]? [¶] [E.R.]: No. [¶] You gonna remember Daddy was tryin' to be nice, Daddy tried to stop it, Daddy didn't wanna kill nobody. You gonna remember all that? [¶] [E.R.]: Yeah. [¶] [Richard]: Its on TV anyway. And you gonna tell the judge that? [¶] [E.R.]: Yeah. [¶] [Richard]: That Daddy tried to s-didn't wanna kill Mommy. He tried-he tried to talk to broth- bro-bro, bro-bro didn't wanna do nothin'. Bro-bro said he was gonna snitch him out too. Remember that part too. [¶] [E.R.] 'Kay. [¶] [Richard]: Bro-bro said even though Daddy was right he was still gonna make him wrong so that's why Daddy killed him."

At sentencing, T.O. reported that E.R. had experienced multiple sleepless nights and nightmares about Richard's threats to kill her family, her school reported behavioral changes, and she was in counseling. T.O. told the court that "[a]s a child, it is hard for her to enjoy her everyday life, replaying the day that Mr. Richard threatened to kill me and her brother and having the memory of the day that he abused me and gave me the black eye."

Moreover, it is certain that domestic violence is detrimental to children. The Legislature has found and declared that "[c]hildren, even when they are not physically assaulted, very often suffer deep and lasting emotional effects." (Welf. & Inst. Code, § 18290.) "Domestic violence [affects] children even if

16

they are not the ones being physically abused 'because they see and hear the violence and the screaming.' " (*In re T.V.* (2013) 217 Cal.App.4th 126, 134.) On this record, the protective order is supported by ample evidence that E.R. was harmed by Richard's domestic violence.

Richard observes that after *People v. Race* was decided, section 136.2, subdivision (i)(1) was amended to limit the parties to be protected by an order to victims of the crimes for which the defendant was convicted. (Pen. Code, § 136.2, subd.(i)(1), as amended by Stats 2018, ch. 805, §1.) To the extent the amendment may limit the holding of *People v. Race,* it is of no matter here because E.R. was harmed by the same acts for which Richard was convicted.

Richard's reliance on *People v. Delarosarauda* (2014) 227 Cal.App.4th 205 is also unavailing. In that case, the victim testified the defendant " 'never touched' " the children and that they were in another room at the time of the domestic violence. (*Id*. at p. 211.) There, the appellate court vacated the postconviction protective order as to the children because there was no "evidence from which the trial court could reasonably conclude [the defendant] had harmed or attempted to harm [the children]." (*Id*. at p. 212.) Here, in contrast, E.R. was present during violent encounters, her father directly engaged her in his threats against her mother and brother, and, not surprisingly, she demonstrated significant emotional distress. The trial court properly protected E.R. with the domestic violence restraining order.

## IV.    Sentencing

The parties agree, correctly, that there are two errors on the abstract of judgment. First, the trial court granted Richard 244 days of conduct credit but the abstract of judgment awards him only 240 days. Second, the abstract fails to reflect that the trial court stayed the $120 court security fee and the $90 criminal conviction assessment it imposed pending a determination of

Richard's ability to pay. The abstract must be corrected to reflect the correct number of conduct credits and that the specified fees are stayed. (See *People v. Mesa* (1975) 14 Cal.3d 466, 471 [abstract of judgment cannot modify the judgment as orally pronounced].) In his opening brief, Richard asked this court to remand the case to the trial court with instructions to strike his two one-year prior prison term enhancements pursuant to the amendment to Penal Code section 667.5, subdivision (b) effective January 1, 2020. We subsequently granted Richard's motion to stay this appeal pending filing and resolution of a superior court petition for relief under the amended statute. On March 30, 2020, the trial court granted Richard's motion to strike and dismiss the two prison prior allegations under the amended law and re-sentenced him to three years in state prison. Accordingly, the issue regarding the enhancements is moot.

## DISPOSITION

The clerk of the superior court is ordered to modify the abstract of judgment to reflect (1) the $120 court security fee and $90 criminal conviction assessment are stayed, and (2) that Richard was awarded 244 days of pre-sentence credit. The clerk is directed to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

18

_____
Siggins, P.J.

WE CONCUR:


_____
Petrou, J.


_____
Jackson, J.

*People v. Richard*, A158285

19